CHARLES DEGNAN,                 Civil No. 08-325 (ADM/AJB)

           Plaintiff,

v.                         **Report and Recommendation on**
                                 **Cross Motions**
                                 **for Summary Judgment**

CHARLES E. JOHNSON, Acting Secretary
of Health and Human Services.

           Defendant.

_____

Plaintiff proceeding *Pro Se*.

Lonnie F. Bryan, Assistant United States Attorney, for Defendant.

_____

## I.  Introduction

      Charles Degnan ("Plaintiff") disputes the unfavorable decision of the Secretary of Health

and Human Services ("Secretary") affirming the ALJ's statutory interpretation of 42 U.S.C. §

1395r(f).  This matter is before the Court, United States Magistrate Judge Arthur J. Boylan, for a

report and recommendation to the District Court on the parties' cross motions for summary

judgment.  See 28 U.S.C. § 636(b)(1) and Local Rule 72.1.  This Court has jurisdiction under the

Medicare Act, 42 U.S.C. § 1395(ff).[1]  Based on the reasoning set forth below, this Court

_____

[1] Judicial review of claims arising under the Medicare Act is available only after the
Secretary renders a "final decision" on the claim, in the same manner as is provided in 42 U.S.C.
§ 405(g) for old age and disability claims arising under Title II of the Social Security Act.
Heckler v. Ringer, 466 U.S. 602, 605 (1984) (citing 42 U.S.C. § 1395ff(b)(1).  42 U.S.C. §
1395ff(b)(1), appeal rights in general, provides in pertinent part:

**recommends** that Plaintiff's Motion for Summary Judgment [Docket No. 24] be **granted in part and denied in part** and that Defendant's Motion for Summary Judgment [Docket No. 20] be **granted in part and denied in part.**

A.       <u>Statutory Framework and Procedural History</u>

Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.,* established the Medicare program.  Medicare Part A provides hospital related insurance for individuals, primarily those over the age of 65, and is financed by the payroll contributions of employees and employers.  <u>See</u> 42 U.S.C. § 1395c-1395i-4.  Anyone entitled to Medicare Part A, or who is age 65 or older, may enroll in Medicare Part B.  42 U.S.C. § 1395o.  Medicare Part B, which is called supplementary medical insurance "SMI,"  is an elective or "voluntary insurance program" which

_____

> (A) Reconsideration of initial determination.
>          . . . any individual dissatisfied with any initial determination under subparagraph (a)(1) shall be entitled to reconsideration of the determination, and, subject to paragraphs (D) and (E), a hearing thereon by the Secretary to the same extent as provided in section 405(b) of this title, subject to paragraph (2), to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title [judicial review of Social Security decisions].  For purposes of the preceding sentence, any reference to the "Commissioner of Social Security" or the "Social Security Administration" in subsection (g) or (l) of section 405 of this title shall be considered a reference to the "Secretary" or the "Department of Health and Human Services," respectively.

Therefore, the Secretary of Health and Human Services is the only proper defendant, and Michael J. Astrue, Commissioner of Social Security should be dismissed as a defendant.

is "financed from premium payments by enrollees" in addition to federal government appropriations. 42 U.S.C. § 1395j. In other words, Part B "resembles a private medical insurance program that is subsidized in major part by the Federal Government." Schweiker v. McClure, 456 U.S. 188, 190 (1982).

An individual who is eligible for Part B benefits may enroll in the program during a "initial enrollment period." 42 C.F.R. § 407.14(a). An initial enrollment period will begin three months before the month in which the individual becomes eligible for Part B benefits, and will end three months after that first month of eligibility. Id. An enrollment application filed during the initial enrollment period will be effective during the first month of eligibility, or at some time over the next six months, depending on when the application is filed. 42 C.F.R. § 407.25(a).

If an individual fails to enroll during the initial enrollment period she may also enroll or re-enroll during a "general enrollment period." 42 C.F.R. § 407.12(a). A general enrollment period will extend from January 1 through March 31 of each calendar year. 42 C.F.R. § 407.15. An enrollment application filed during this time will be effective on July 1 of that calendar year. 42 C.F.R. § 407.25(b)(1).

The Secretary sets a new premium for each year. 42 U.S.C. § 1395r(a)(3). This premium is subject to various increases or decreases under other subsections of the statute. 42 U.S.C. § 1395(a)(2). An individual who enrolls or re-enrolls after the expiration of her initial enrollment period pays a premium increase of "10% of the monthly premium so determined for each of the full twelve months . . . in which he could have been but was not enrolled." 42 U.S.C. § 1395r(b). This subsection reflects Congress' concern that "those who opt-in to Medicare Part B at a later age, when the risk of higher health costs has increased, will not unfairly benefit at the expense of

those who have paid into Medicare Part B for many years." <u>Fields v. Sullivan</u>, 789 F.Supp. 739, 742 (W.D. Va. 1992).

Subsection (f) of the statute operates to limit monthly premium increases "to the extent that such increase would reduce the amount of benefits payable to that individual for that January below the amount of benefits payable to that individual for that December (after the deduction of the premium under this section). 42 U.S.C. § 1395(f). Subsection (f) reflects Congress' concern that Medicare Part B costs (thus, the premiums charged) are increasing at a higher rate than cost of living adjustments to social security retirement benefits, from which the Medicare Part B premiums are deducted. <u>See</u> Jim Hahn, MEDICARE: PART B PREMIUMS at 6-9, Congressional Research Service, 7-5700, December 29, 2008 (describing history of Part B Premium).

In this case, Plaintiff's initial enrollment period closed on April 30, 1998. (Complaint ¶ 5 Docket No. 1) (hereinafter "Compl.") However, Plaintiff did not enroll in Medicare Part B until July 2003. (<u>Id.</u> at ¶¶ 5-6). Pursuant to 42 U.S.C. § 1395r(b), the amount of Plaintiff's premium increase in his first year of enrollment was 40% because four full 12-month periods elapsed between when Plaintiff could have enrolled and when he actually enrolled for Part B benefits. (<u>Id.</u> at ¶ 5). Generally, the issue presented is how Plaintiff's 40% increase pursuant to subsection (b) is calculated when considered together with subsection (f), which places certain limits on premium increases.

Plaintiff wrote a letter to the SSA regarding his retirement benefits in April 2004, stating he did not believe his benefits should go down "because of the Medicare." (Tr. 305). The SSA responded that,

The base rate of the premium has been reduced, however, you are subject to a 40% penalty for late enrollment and that is not adjusted to protect your benefits.

In June 2003, your benefit amount was $186.70 and the [Medicare Part B] premium was $58.70. The penalty was $23.50. If you would have had no penalty, you would have received $128.00. The next year, your benefit went up to $190.60 and the premium went up to $66.60. If you would have had no penalty, your check would have been for $124.00. We reduced the base of the premium to $62.60, but you still owe the 40% penalty amounting to $26.60 so we have to charge you $89.20 for your Medicare and your net payment goes down because of the penalty.

Again, this year, your benefit went up to $197.80 and the premium went up to $78.20. Since we round the extra dimes down, you would have received only $119.00 so we reduced the based premium down from $78.20 to $67.20. However, you still owe a 40% penalty on the $78.20 or $31.30 so we have to charge you $98.50 for your Medicare and your net payment will go down.

(Tr. 305-07).

Plaintiff received Notices of Change in Benefits from the Social Security Administration in September 2005, and January 2006, notifying Plaintiff of the withholding from his check. Thereafter, the SSA found an error in its previous calculation and informed Plaintiff that his "premium rate should go down, however, you are still subject to the 40% penalty for late enrollment. We will refund the $59.00 we withheld from your check. Your premium rate for medical is $110.90." (Tr. 285-86). Although the letter is undated, it appears that the SSA found another mistake, resulting in Plaintiff being overpaid $59.00. (Tr. 293). Plaintiff was later notified that his premiums were correct, and his monthly benefit checks, beginning in April 2006, would be for $100.00. (Tr. 282-84).

Plaintiff responded that the issue he raised on appeal regarding "nonstandard premium increases to the premium surcharges for late-enrollees . . ." had not been addressed. (Tr. 288).

Plaintiff noted that he had received no response to two Requests for Reconsideration. (Id.) After SSA declined Plaintiff's requests, he appealed to an SSA Administrative Law Judge ("ALJ") on June 15, 2006. (Tr. 252). ALJ William S. Steele held a hearing on August 25, 2006 (Tr. 342-367), and issued a unfavorable decision to Plaintiff on December 14, 2006. (Tr. 50-66).

On February 17, 2007, Plaintiff filed a "Request for Review of Administrative Law Judge (ALJ) Medicare Decision/Dismissal" with the Department of Health and Human Service's Appeals Board. (Tr. 26). Due to its inability to obtain the administrative record, the Medicare Appeals Council ("MAC") vacated the ALJ's prior decision and remanded the case to the ALJ on May 9, 2007. (Tr. 232). The ALJ was given the option to continue efforts to retrieve the original record. (Tr. 232). If the complete record could not be obtained, the ALJ was instructed to either reconstruct the record, develop a new record, or hold a de novo hearing. (Tr. 232). After the record was reconstructed, the ALJ issued an amended decision on July 26, 2007, which is summarized below in Section II.B. (Tr. 214-230). On October 19, 2007, the MAC denied Plaintiff's request for review and noted that the ALJ's decision was the final decision of the Secretary. (Tr. 3-6).

Plaintiff then wrote a letter to the MAC, which was construed as a request for reopening. (Tr. 7-8, 14-18); see also 20 C.F.R. § 404.987-88. By letter dated January 3, 2008, the MAC found no basis for reopening its October 19 decision, and again stated that said decision stood as the final decision of the Secretary. (Tr. 7). The Council also extended the time for Plaintiff to file an action in federal court seeking review of its decision. (Tr. 8). On February 6, 2008, Plaintiff filed this action. Plaintiff's Complaint is summarized below in Section II.C.

**B.**    <u>The ALJ's July 26, 2007 Amended Decision</u>

The ALJ framed the issue before him as follows: "Is an individual who suffers a surcharge/penalty for late enrollment to Medicare Part B susceptible to Part B premium increases which, when combined, exceeds the COLA payment increase, thereby reducing his monthly payment?" (Tr. 215.) The ALJ concluded:

> The Appellant experienced a decrease in his monthly benefits as a result of the addition of the applicable 40% penalty to the increase in his Medicare Part B premium (as adjusted to not exceed COLA). The decrease in monthly benefits was not due to an increase in the monthly premium exceeding the COLA. The decrease is directly related to the Appellant's 40% penalty.

(Tr. 216).

Before explaining his analysis, the ALJ set forth the pertinent provisions of the statute, 42 U.S.C. § 1395r(a),(b), (c) and (f), and the agency regulations relating to those provisions, 42 C.F.R. §§ 408.20-22, as well as sections of the Federal Register from 2006, 1989, 1987, and 1986[2] that pertain to the statute and regulations. (Tr. 217-226). The ALJ also quoted the following definitions:

> ***Glossary- www.medicare.gov***
>
> PREMIUM - The periodic payment to Medicare, an insurance company, or a health care plan for health care or prescription drug coverage.
>
> PENALTY - An amount added to your monthly premium for Medicare Part B, or for a Medicare Prescription Drug Plan, if you don't join when you're first able to. You pay this higher amount as long as you have Medicare. There are some exceptions.

---

[2]    The ALJ cited 71 Fed. Reg 54665-67 (September 18, 2006); 54 Fed. Reg. 43862 (October 27, 1989); 52 Fed. Reg. 36716 (September 30, 1987); and 51 Fed. Reg. 35291-01 (October 2, 1986).

*Webster's New World Dictionary and Thesaurus*

Surcharge - a) an additional amount added to the usual charge.

(Tr. 226).

The ALJ began his analysis:

> The Appellant claims immunity from any increase to the
> surcharge/penalty (hereinafter interchangeable as determined by
> definition . . .) after his 2003 enrollment under subsection (f) of §
> 1839 of the Act's limit of <u>total</u> premium increases to no more than
> that year's Cost of Living Adjustment (COLA) benefits. . .
> [Emphasis Added].  A Letter from the Social Security
> Administration (SSA) dated September 15, 2005 states the 40%
> penalty applicable to the Appellant for late enrollment is not
> adjusted to protect his benefits. . . The base rate of the premium
> has been reduced. . .
>
> Section 1839(f) of the Act does not state the limit on SMI
> increases is a limit of total premium increases.  *See* 1839 (f) of the
> Act [42 U.S.C. § 1395r].  Individuals who have enrolled in Part B
> late or who have reenrolled after the termination of a coverage
> period are subject to an increased premium under section 1839(b)
> of the Act. ***The increase is a percentage of the premium and is***
> ***based on the <u>new premium rate before any reductions</u> under***
> ***section*** 1839(f) of the Act are made . . . Section 1839(a)(2) of the
> Act clarifies the calculation of the premium by stating "the
> monthly premium of each individual enrolled under this part for
> each month after December 1983 shall be the amount determined
> under paragraph (3) adjusted as required in accordance with
> subsections (b), (c), (f), and (i) of this section." . . . [footnotes and
> citations omitted.]

(Tr. 227).  Plaintiff had argued that in 2006 the Medicare website indicated "by law, the Part B

premium increase cannot be larger than a beneficiary's COLA increase."  In response, the ALJ

stated, "[t]he definition of a premium does not include any penalty assessed for late enrollment."

(Tr. 227).  The ALJ cited to the definition of "premium" found on the Medicare website.  (Tr.

227).  The ALJ also reasoned that "the monthly premium and the penalty are two distinct

8

elements of the Part B premium, they are equally addressed in separate subsections of § 1839.

(Tr. 228).

The ALJ explained Plaintiff's situation as follows:

> In this case, the Appellant's monthly benefit was in fact reduced. However, that reduction was not the result of the yearly premium increase to the Part B premium. The Appellant's premium increase was reduced so as not to exceed the COLA increase for the applicable year. The Appellant's premiums ($66.60 for 2004, $78.20 for 2005, and $88.50 for 2006) were adjusted to not exceed the COLA and his monthly benefit further adjusted in accordance with subsection (b) of § 1839 to adequately reflect the beneficiary's penalty for late enrollment . . . The Appellant argues the applicable penalty should only be $23.50 (the standard penalty as first applied in June 2003) and should be immune from any subsequent increases to the surcharge under the hold-harmless provision of Section 1839 of the Act . . . However, the penalty for late enrollment is not governed by subsection (f) of § 1839.

(Tr. 228). The ALJ cited the agency regulation at 42 C.F.R. § 408.20(e)(6), for the proposition that penalties are excluded from the limit on premium increases. (Tr. 229). The ALJ concluded that to ignore the "intent of the limited application of the hold-harmless provision . . . would make the application of a penalty obsolete and result in the unfair implementation of non-penalty Part B premiums for those who did not enroll on time," and "to allow those who enrolled late to the same benefits of a premium limitation, including a reduction to the amount of the penalty, would effectively result in the absence of a penalty." (Tr. 229-30). Thus, the ALJ held that subsection (f) of 42 U.S.C. § 1395r does not apply to late enrollment penalties. (Tr. 230).

### C. **The Complaint**

Plaintiff enrolled in Medicare Part B, fifty-nine months after his initial enrollment period, which closed on April 30, 1998. Compl. ¶ 5. On July 1, 2003, Plaintiff became eligible for withholding of his Medicare Part B premium from his social security retirement benefits

[hereinafter "OAI or OASDI benefit"]. (Id. at ¶ 6.) The monthly premium announced by the Department for new enrollees that year was $58.70. (Id.) In addition, Plaintiff paid $23.50 "as the forty percent increase for late enrollment pursuant to subsection 1839(b), for a total withheld premium of $82.50 and a net OAI benefit of $104.00, after rounding benefit cents down to the next lower dollar as prescribed in the Act." (Id.) Plaintiff asserts that in each January of the years 2004 through 2006, the lesser of the respective year's standard increase to the [Medicare Part B] premium or an amount equal to Plaintiff's cost-of-living adjustment . . . for the same year were withheld from his OAI benefits as directed in 42 U.S.C. § 1395r(f). (Id. at ¶ 7.) Additionally, forty percent of the respective years' standard monthly premium increase was withheld as an adjustment for Plaintiff's late enrollment, pursuant to 42 U.S.C. § 1395r(b), even though, each year, this reduced "Plaintiff's OAI, net of withheld premium, from what had been paid in the next previous month (the December payment of that year's November-accrued benefit.)" (Id.)

Plaintiff asserts that the increases to the premium promulgated by the Secretary for the years 2007 and 2008, plus the forty percent adjustment for his late enrollment, have not exceeded his respective COLA's for those years, so the withholding of the "full standard increases to [Medicare Part B] base and late-charge premiums have not in these years caused reduction in his net OAI due to these increases. . . However, the reductions built into his premium from the three prior years carry forward and still cause the monthly premium withheld in 2007 and 2008 to exceed by $11.92 what would have been collected but for those earlier deductions to net OAI." (Id. at ¶ 8.)

Plaintiff set forth the following table in Paragraph 9 of the Complaint:

| | Base Premium Amount: | | | | 40% Late Enrollment Premium | | | |
|---|---|---|---|---|---|---|---|---|
| | (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) |
| | | Yr To Yr | | Yr To Yr | | Yr To Yr | | Yr To Yr |
| Year | Standard | Increase | Variable | Increase | Standard | Increase | Variable | Increase |
| 2003 | $58.70 | na | na | na | $23.50 | na | na | na |
| 2004 | 66.60 | 7.90 | 62.60 | 3.90 | 26.66 | 3.16 | 23.50 | 0.00 |
| 2005 | 78.20 | 11.60 | 67.20 | 4.60 | 31.30 | 4.64 | 23.50 | 0.00 |
| 2006 | 88.50 | <u>10.30</u> | 75.50 | <u>8.30</u> | 35.40 | <u>4.12</u> | 23.50 | <u>0.00</u> |
| 3-yr totals | | 29.80 | | 16.80 | | 11.92 | | 0.00 |
| 2007 | 93.50 | 5.00 | 80.50 | 5.00 | 37.40 | 2.00 | 25.50 | 2.00 |
| 2008 | 96.40 | 2.90 | 83.40 | 2.90 | 38.56 | 1.16 | 26.66 | 1.16 |

Plaintiff asserted the correct increase to his late-enrollment premium in each of the years 2004-2006 was zero.  (Compl. ¶ 10.)  Thus, Plaintiff concluded, the total unlawful charges "built into and remaining in Plaintiff's premium from those three years are $11.92 per month."  (Id.)  According to Plaintiff, the correct monthly adjustments for his late-enrollment are listed in column (g) of the above table, in contrast with the late adjustment actually withheld, as shown in column (e).  (Id.)

Plaintiff noted that the MAPSC, when interpreting the statute, cited Public Law 980-369, Section 230, July 18, 1984, a version of the relevant statute that was in effect in 1984, but was significantly amended in 1988.  (Compl. ¶ 12.)  The significance of this, Plaintiff asserted, is that in 1984 the statute contained six "disqualifying references to charges under subsection 1839 (b)

of the Act . . . [late enrollment premium increase]" and "replacement of the phrase 'the monthly premium amount determined under subsection (a)(2) . . .' in the original with '. . . the monthly premium otherwise determined under this section . . .' in its replacement." (Id.)  Plaintiff asserted that those two statutory changes made up the core of the issue in his administrative appeals, which was never acknowledged at any level of agency review.  (Compl. ¶ 14).

Plaintiff noted that, in affirming MAPSC's ruling, the ALJ cited 42 C.F.R. § 408.20(e)(6), and other extracts from the Federal Register and the Commissioner's Program Operations Manual System "POMS" to the same effect as the regulation.  (Id. at ¶ 13).  The crux of Plaintiff's statutory interpretation argument appears in Paragraph 15 of the Complaint:

> The Secretary's regulation in 42 C.F.R. 408.20(e)(6) took its present form in January 1988, over five months before enactment of the [1989 changes to 1839 subsection (f)] and its text has never been changed thereafter.  When adopted, it did conform to the version of subsection (f) then in force, but became invalid on January 1, 1989, when the [1989] changes took effect.  It and all subsequent Federal Register notices or POMS extracts of like import patterned after it are likewise invalid after 1988 as violative of subsection 1839(f).

Plaintiff's second claim in the Complaint is that the Commissioner has so unreasonably delayed, and inadequately rendered, the processing of Plaintiff's appeals as to violate Plaintiff's rights to administrative due process of law.  (Compl. ¶ 16).  Plaintiff cited to delays in responding to his requests for reconsideration, and lack of acknowledgment of the issues he raised.  (Id.)  Plaintiff also alleged the Medicare Office of Hearings and Appeals in Cleveland, Ohio "COMHA" and the MAC violated his administrative due process rights.  (Id. at ¶ 17.)  In support of this allegation, Plaintiff alleged COMHA omitted certain records Plaintiff submitted for inclusion in the record of the ALJ hearing, and his local social security office lost hearing

exhibits shipped to them upon entry of the ALJ's decision.  (Id.)  Plaintiff also alleged MAC

accepted a reconstructed file from COMHA that did not include any certification as to the

authenticity of the reconstructed file.  (Id.)  On this basis, Plaintiff petitioned MAC for a

rehearing before the ALJ with a new list of exhibits to be included.  (Id.)  Plaintiff's request for

rehearing was denied.  (Id.)

Plaintiff's Prayer for Relief goes beyond the standard request to reverse the ALJ's

decision.  In paragraphs 19-23 of the Complaint, Plaintiff requested declaratory judgment type

relief (Compl. ¶¶ 20-21), injunctive type relief (Compl. ¶¶ 22-23) and class-wide relief (Compl.

¶ 22).

## II.    Discussion

### A.    Standard of Review

The familiar standard of review for social security and medicare appeals is that the

reviewing court should affirm if the factual findings of the Secretary [or Commissioner] are

supported by substantial evidence on the record as a whole.  Horras v. Leavitt, 495 F.3d 894,

899-900 (8th Cir. 2007) (citing 42 U.S.C. § 1320a-7a(e));  Brueggemann v. Barnhart, 348 F.3d

689, 692 (8th Cir. 2003).  However, in this case the parties agree that there are no facts in

dispute.  Plaintiff exclusively presents a legal issue of statutory interpretation.  Statutory

interpretation begins with the plain language of the statute.  See Lamie v. U.S. Trustee, 540 U.S.

526, 534 (2004) (when statute's language is plain, courts must enforce it according to its terms).

When the language of a statute is clear, the inquiry ends, and a court need not defer to a federal

agency's contrary interpretation of the statutory scheme.  Chevron v. U.S.A., Inc. v. Natural

Resources Defense Council, Inc., 467 U.S. 837, 844 (1984);  Horras, 495 F.3d at 900.  If the

language of the statute is ambiguous or silent, the issue for the court is whether the agency's

interpretation of the statute is a reasonable one.  <u>Smiley v. Citibank, N.A.</u>, 517 U.S. 735, 744-45

(1996).

> **B.**     **<u>Statutory Interpretation:  42 U.S.C. § 1395r(f)</u>**

Beginning, as the court must, with the plain language of the statute, it provides in

pertinent part, beginning with subsection (a):

> (a) Determination of monthly actuarial rates and premiums
>
> (1) The Secretary shall, during September 1983 and of each year
> thereafter, determine the monthly actuarial rate for enrollees age
> 65 and over which shall be applicable for the succeeding calendar
> year. . .
>
> (2) The monthly premium of each individual enrolled under this
> part for each month after December 1983 shall be the amount
> determined under paragraph (3), adjusted as required in
> accordance with subsections (b), (c), (f), and (i) of this section and
> to reflect any credit provided under section 1395w-
> 24(b)(1)(C)(ii)(III) of this title.
>
> (3) The Secretary, during September of each year, shall determine
> and promulgate a monthly premium rate for the succeeding
> calendar year that (except as provided in subsection (g)) is equal to
> 50 percent of the monthly actuarial rate for enrollees age 65 and
> over, determined according to paragraph (1) for that succeeding
> calendar year.
>
> (b) Increase in monthly premium
>
> In the case of an individual whose coverage period began pursuant
> to an enrollment after his initial enrollment period (determined
> pursuant to subsection (c) or (d) of section 1395p of this title) and
> not pursuant to a special enrollment period under section 1395p(4)
> of this title, the monthly premium determined under subsection (a)
> of this section (without regard to any adjustment under subsection
> (i) of this section) shall be increased by 10 percent of the monthly
> premium so determined for each full 12 months (in the same
> continuous period of eligibility) in which he could have been but

14

was not enrolled.

(c) Premiums rounded to nearest multiple of ten cents

If any monthly premium determined under the foregoing
provisions of this section is not a multiple of 10 cents, such
premium shall be rounded to the nearest multiple of 10 cents.

. . .

(f)  For any calendar year after 1988, if an individual is entitled to
monthly benefits under section 402 or 403 of this title...for
November and December of the preceding year, if the monthly
premium of the individual under this section for December and for
January is deducted from those benefits under section 1395s(a)(1)[3]
. . . of this title, and if the amount of the individual's premium is
not adjusted for such January under subsection (i) of this section,
the monthly premium otherwise determined under this section for
an individual for that year shall not be increased, pursuant to this
subsection, to the extent that such increase would reduce the
amount of benefits payable to that individual for that December
below the amount of benefits payable to that individual for that
November (after the deduction of the premium under this section).

Significantly, subsection (a)(2) defines "the monthly premium of each individual enrolled under

this part for each month after December 1983," and subsection (b) refers to an "increase in

monthly premium," and specifically, "the monthly premium determined under subsection (a) of

this section.  Subsection (b) never uses the words "surcharge" or "penalty."

_____

[3]      42 U.S.C. § 1395(s)(a)(1) provides:
(a) Deductions from section 402 or 423 monthly benefits
(1) In the case of an individual who is entitled to monthly benefits
under section 402 or 423 of this title, his monthly premiums under
this part shall (except as provided in subsections (b)(1) and (c) of
this section) be collected by deducting the amount thereof from the
amount of such monthly benefits.  Such deduction shall be made in
such manner and at such times as the Commissioner of Social
Security shall by regulation prescribe.  Such regulations shall be
prescribed after consultation with the Secretary.

"Statutory definitions control the meaning of statutory words . . . in the usual case."

Burgess v. U.S., 128 S.Ct. 1572, 1577 (2008) (quoting *Lawson v. Suwanee Fruit & S.S. Co.*, 336 U.S. 198, 201, 69 S.Ct. 503, 93 L.Ed.2d 611 (1949) *see also Stenberg v. Carhart*, 530 U.S. 914, 942, 120 S.Ct. 2597. 147 L.Ed.2d 743 (2000) ("When a statute includes a specific definition, we must follow that definition . . . ."; 2A N. Singer & J. Singer, Statutes and Statutory Construction § 47:7, pp. 298-299, and nn. 2-3 (7th ed. 2000)). 42 U.S.C. § 1395r(a)(2) defines "the monthly premium of each individual enrolled under this part." "Enrolled under this part" refers to Title 42, Chapter 7, Subchapter XVIII, Part B Supplementary Medical Insurance Benefits for Aged and Disabled. Plaintiff falls within this definition. Therefore, his monthly premium, under the plain language of the statute "shall be the amount determined under paragraph (3), adjusted as required in accordance with subsections (b), (c), (f), and (i) of this section and to reflect any credit provided under section 1395w-24(b)(1)(C)(ii)(III) of this title. Subsection (i) does not apply to Plaintiff because he did not meet the income requirements for a premium increase. The record does not indicate that any credit was provided under 1395W-24(b)(1)(C)(ii)(III), therefore, this is also irrelevant to Plaintiff's monthly premium.

For the following analysis, the Court assumes that Plaintiff's gross OASDI benefits are correctly set forth at pages 170 and 285 of the transcript, and that gross benefit amounts from prior months of a respective year did not change in November, and changed in December only due to a cost of living increase.[4] The Court also assumes the premium set by the Secretary for

---

[4] Th record contains a letter from Plaintiff to the SSA, challenging the benefit amounts listed in the SSA's September 14, 2005 letter (Tr. 170-71) to him. See Tr. 248, final paragraph. The record does not contain a direct response from the SSA to this issue.

the year 2006 was $88.50, as set forth in paragraph 9 of the Complaint.

The premium set by the Secretary under paragraph (a)(3) for January 2004 was $66.60, and the monthly premium under paragraph (a)(3) for the preceding year was $58.70. (Tr. 170.) In the preceding year, pursuant to subsection (b), Plaintiff's premium would have been 58.70 + 40% ($23.48) for a total of $82.18. Pursuant to subsection (c), the number would have been rounded to $82.20.

Following the statutory language in subsection (a)(2), the premium must be "adjusted as required in accordance with subsections (b), (c), (f), and (i) of this section and to reflect any credit provided under section 1395w-24(b)(1)(C)(ii)(III) of this title." Based on Plaintiff's enrollment status, the first adjustment to the monthly premium under subsection (b) adds 40% to "the monthly premium determined under subsection (a)." Thus, for January 2004, forty percent of $66.60 ($26.64) would have been added to $66.60 for a total of $93.24. The second adjustment, under subsection (c), would result in the monthly premium being rounded to $93.20.

Plaintiff's gross OASDI November 2003 benefit was $186.70, and the gross December 2003 benefit was $190.60. (Tr. 170.) The first step under subsection (f) is to "deduct the monthly premium of the individual under this section for December and for January." It is important to note that the Medicare Part B "premiums are deducted one month in advance." (Tr. 67). Thus, the December premium is deducted from the benefit for November, and the January premium is deducted from the benefit for December. (Tr. 67). The annual OASDI COLA increase and the [Medicare Part B] premium increase arrive together for the December payment." (Tr. 67). Thus, Plaintiff's December 2003 premium of $82.20 would have been deducted from his November benefit of $186.70, and he would have received a net OASDI

17

benefit check of $104.50. Plaintiff's January premium of $93.20 would have been deducted from his December benefit of $190.60, and he would have received a net OASDI benefit check of $97.40 in December 2003.

The statute then states, in pertinent part, "the monthly premium otherwise determined under this section for an individual for that year shall not be increased, pursuant to this subsection, to the extent that such increase would reduce the amount of benefits payable to that individual for that December below the amount of benefits payable to that individual for that November (after the deduction of the premium under this section)." Therefore, Plaintiff's monthly premium for January 2004 "shall not be increased" . . . "to the extent that such increase would reduce the amount of benefits payable" for December 2003, below the amount payable in November 2003 (after deduction of the premium under this section). In Plaintiff's case, his net benefit check in November 2003 would have been $104.50, and his net benefit check in December 2003 would have been $97.40, but such an increase in his premium would not be allowed because his net benefit would shrink from $104.50 to $97.40. Therefore, his premium could only be increased to the extent that he would still receive a net benefit of $104.50. By deducting $104.50 from his gross benefit amount for December 2003 ($190.60), the result is that his premium could only be increased to $86.10 (instead of $93.20).

The same process would have been followed in subsequent years. When the Secretary raised the premium for 2005 (Tr. 170) to $78.20, forty percent ($31.28) would have been added to Plaintiff's premium pursuant to subsection (b) for a total of $109.48. Pursuant to subsection (c), this would have been rounded to $109.50. Plaintiff's December 2004 benefit payment (before premium deduction) was $197.80. (Tr. 170.)

Plaintiff's gross OASDI benefit for November 2004 was $190.60. (Tr. 170.) His December 2004 benefit was raised to $197.80. (Tr. 170.) Under subsection (f), Plaintiff's December 2004 premium of $86.10 is deducted from his November benefit of $190.60, resulting in a net benefit check of $104.50. Plaintiff's January premium of $109.50 is deducted from his December benefit of $197.80, resulting in a net benefit of $88.30. Under subsection (f), Plaintiff's net benefit in December 2004 can not decrease below what he received in November 2004, $104.50. By deducting $104.50 from his gross benefit amount for December 2004, $197.80, we find that his premium for 2005 could only be increased to $93.30 (instead of $109.50).

The Secretary raised the premium for 2006 to $88.50. (Compl. ¶ 9). Forty percent would have been added to Plaintiff's premium pursuant to subsection (b) ($88.50 + $35.40), for a total of $123.90. No rounding would have been necessary pursuant to subsection (c).

Plaintiff's gross OASDI benefit for November 2005 was $197.80. (Tr. 170.) His December 2006 benefit was raised to $210.90.[5] Plaintiff's December 2005 premium of $93.30 would have been deducted from his November 2005 benefit of $197.80 for a net benefit check of $104.50. Plaintiff's January 2006 premium of $123.90 would have been deducted from his December benefit of $210.90, resulting in a net benefit of $87.00. Under subsection (f), Plaintiff's net benefit can not decrease below what he received in November 2005, $104.50. By deducting $104.50 from his gross benefit amount for December 2005, $210.90, we find that his premium for 2006 can only be increased to $106.40 (instead of $123.90). The same process

---

[5]     The Court deduced the gross benefit of $210.90 by adding the premium actually withheld from Plaintiff's benefit, $110.90, to the net benefit he received in February 2006 (and in subsequent months), $100.00. See Tr. 285.

would continue in subsequent years.

The ALJ erred by not calculating Plaintiff's premium according to the plain language of the statute. Instead, the ALJ affirmed the calculation set forth in the agency regulation, 20 C.F.R. § 408.20(e)(6) and the instructions in the POMS manual § HI 01001.004. Under the formulas in the regulation and the POMS manual, subsection (b) is in effect disregarded when calculating subsection (f), and then 40% is added to the premium announced by the Secretary for the next year, and that is added to the "variable" premium amount determined under subsection (f). By disregarding subsection (b) when calculating subsection (f), the ALJ ignores the language of subsection (f) which states, "the monthly premium otherwise determined under this section for an individual for that year shall not be increased . . ." As described above, the plain reading of the statute indicates that the "monthly premium otherwise determined under this section for an individual" requires an adjustment to the premium under subsection (b) if the individual was a "late-enrollee." The 40% adjustment should be included in the subsection (f) application, as demonstrated above.

Because the plain language of the statute dictates a different calculation than that used by the ALJ, the Court need not reach the issue of whether the agency's interpretation of the statute was a reasonable one. The Court does, however, note that the legislative and regulatory history supports Plaintiff's argument that the agency did not update the regulation to reflect the changes made to the language of the 1984 version of the statute by the 1988 amendments, which expressly directed the agency to disregard subsection (b) when calculating subsection (f), among

other changes.[6]

The ALJ justified his statutory interpretation by noting the difference between a "premium" and a "penalty" or "surcharge." The ALJ did not find these definitions in the statute, he cited general terms for premium and penalty on the Medicare website, and the dictionary definition for surcharge. The statute at issue never uses the terms "penalty" or "surcharge." Instead, it defines the Medicare Part B (SMI) premium for each month as "the amount determined under paragraph (3), adjusted as required in accordance with subsections (b), (c), (f), and (i) of this section and to reflect any credit provided under section 1395w-24(b)(1)(C)(ii)(III) of this title." This is significantly different from the more general definition of a premium used by the ALJ. The statutory language, by requiring an adjustment pursuant to subsection (b) when appropriate, encompasses what the ALJ defined as a penalty or surcharge within the definition of an individual's monthly premium. Thus, the ALJ incorrectly concluded that "[t]he definition of a premium does not include any penalty assessed for late enrollment." (Tr. 227).

As the hypothetical above demonstrates, the ALJ was also wrong to conclude "that to ignore the "intent of the limited application of the hold-harmless provision [subsection (f)] . . . would make the application of a penalty [subsection (b)] obsolete and result in the unfair implementation of non-penalty Part B premiums for those who did not enroll on time," and "to allow those who enrolled late to the same benefits of a premium limitation, including a reduction

---

[6]    See Tr. 253-54; and see Deficit Reduction Act of 1984, Pub.L. 98-369, § 2303, 98 Stat. 494 (1984) (adding subsection (f) to Section 1839 of the Social Security Act; compare Medicare Catastrophic Coverage Act, Pub.L. 100-360, § 211(b), 102 Stat. 683 (1988) (amending subsection (f) of Section 1839 of the Social Security Act); see also 51 Fed. Reg. 35291-01 (Oct. 2, 1986) [pre-1988 amendments]; compare 54 Fed. Reg. 43862 (Oct. 27, 1989); and 71 Fed. Reg. 54665-67 (Sept. 18, 2006).

to the amount of the penalty, would effectively result in the absence of a penalty." (Tr. 229-30).

Under the plain language of the statute, the monthly premium is increased for late enrollment

[the so-called penalty] and the comparison, under subsection (f), of prior year benefits also takes

into account that an individual was paying an increased premium [the so-called penalty] in the

previous year, thus reducing his net benefit below those who were not late-enrollees. In this

manner, the *total* premium is adjusted to prevent the individual from suffering a decrease in his

*net* benefit. Thus, the so-called penalty is in no way obsolete, absent or unfair to "on-time

enrollees".

### C. Due Process

Plaintiff claims that he was denied due process due to the loss and reconstruction of the

administrative record, as well as delays in the administrative proceedings. (Compl. ¶¶ 17-18).

The MAC held that Plaintiff's due process rights were not violated as "[t]he ALJ conducted a *de

novo* review of the record after providing the beneficiary with a hearing, and the beneficiary was

given a full and fair opportunity to present his case." (Tr. 5).

Generally, due process requires notice and an opportunity to be heard. Board of Regents

of State College v. Roth, 408 U.S. 564, 570 n. 7 (1972); see also Hollon ex rel Hollon v.

Commissioner of Social Sec., 447 F.3d 477, 488 (6th Cir. 2006) (basic principles of due process

require notice and opportunity to be heard before social security disability benefits can be

denied). Despite the fact that the MAC could not retrieve Plaintiff's file for its review of the

ALJ's decision, the Council complied with Plaintiff's due process rights by vacating the ALJ's

initial decision, and remanding Plaintiff's case so that the ALJ could reconstruct the record or

develop a new record. (Tr. 232). The only issue before the administrative law judge was the

statutory interpretation of 42 U.S.C. § 1395r(f), and the ALJ's review was de novo. Unlike the usual case where factual issues are in dispute, the only information necessary to the ALJ's review was how the agency had interpreted the statute, and Plaintiff's argument of how the statute should have been interpreted. This information is contained in the reconstructed record, thus, Plaintiff was given an adequate opportunity to be heard.

Furthermore, the Court finds that the delays in reaching a final decision to Plaintiff's claims in this case did not deprive him of due process. Plaintiff made his first request for reconsideration of an agency determination in April 2005, and filed his request for a hearing before an ALJ on June 15, 2006. (Compl. ¶ 11). From the date of ALJ Steele's initial decision in this case on December 14, 2006, to the date that the MAC denied Plaintiff's request for review on January 3, 2008, approximately thirteen months had passed, with roughly two and a half months of delay due to the lost administrative record.

"Regrettably, delay is a natural concomitant of our administrative bureaucracy." Issacs v. Bowen, 865 F.2d 468, 477 (2d Cir. 1989). The Supreme Court in Heckler v. Day, 467 U.S. 104 (1984), rejected the claim that the federal courts could prescribe mandatory deadlines under the Act for the processing of Social Security claims. Under the similar administrative process of social security disability claims, the Court noted, "Congress repeatedly has been made aware of the long delays associated with resolution of disputed disability claims and repeatedly has considered and expressly rejected suggestions that mandatory deadlines be imposed to cure that problem." Id. at 111. The Court further stated, "Certainly in Congress the concern that mandatory deadlines would jeopardize the quality and uniformity of agency decisions has prevailed over considerations of timeliness." Id. at 114.

Here, the total of two years and eight months for the entire administrative review process was not a constitutionally unreasonable delay.  See Littlefield v. Heckler, 824 F.2d 242, 247 (3rd Cir. 1987) (nine month delay between decision of ALJ and final decision of Medicare Appeals Counsel not violative of due process); Reagan v. Secretary of Health & Human Servs., 877 F.2d 123, 126 (1st Cir. 1989)(65 day delay by Appeals Council was not unreasonable); Issacs, 865 F.2d at 477 (neither the six-month delay created by additional hearing, nor the estimated total of 19 months from claim initiation to completion of ALJ review considered remarkable).  "Of course delay can be so unreasonable as to deny due process, such as ...when a recipient demonstrates immediate financial need." Issacs, 865 F.2d at 477.  However, this does not apply to Plaintiff because he has not shown that he has an immediate financial need for the small sum at issue in this litigation.

### D.    Relief Requested

As noted above, this court's jurisdiction to review the Secretary's decision is pursuant to 42 U.S.C. § 405(g).  Relief under this provision is limited to "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  Therefore, Plaintiff is not entitled to declaratory judgment type relief, injunctive type relief, or class-wide relief that he requested.

## III.    Conclusion

The Secretary miscalculated Plaintiff's Medicare Part B premiums with respect to the COLA increase for the year 2004 and subsequent years, which are each affected by prior year premium calculations.  The formula used by the Secretary is not consistent with the plain language of the statute.  Therefore, the case should be remanded for calculation of Medicare Part

B Premiums beginning in the year 2004, and each subsequent year, consistent with the process spelled out in this Report and Recommendation, and Plaintiff should be refunded any amount due. Plaintiff's requests for other types of relief based on the miscalculation should be denied. Plaintiff's due process claims should also be denied.

## IV.  **Recommendation**

Therefore, the Court **recommends** that:

1.    Michael J. Astrue, Commissioner of Social Security be dismissed as a defendant;

2.    Plaintiff's Motion for Summary Judgment [Docket No. 20] be **granted in part and denied in part**; and

3.    Defendants' Motion for Summary Judgment [Docket No. 24] be **granted in part and denied in part**; and

4.    the case be remanded to the Secretary  for calculation of Medicare Part B premiums beginning in the year 2004, and each subsequent year, consistent with the process spelled out in this Report and Recommendation, and Plaintiff should be refunded any amount due.

Dated: June 19, 2009

____ s/ Arthur J. Boylan_____
Arthur J. Boylan
United States Magistrate Judge

**Notice**

Pursuant to Local Rule 72.2 (b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from

the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.

Written objections must be filed with the Court before July 6, 2009.